Filed 11/5/13  P. v. Perez CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B242119 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.  LA064981) |
| v. | |
| JOSE PEREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael K. Kellogg, Judge.  Affirmed.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Jose Perez challenges his convictions for kidnapping to commit rape, attempted kidnapping to commit rape, and other offenses. He contends the trial court erred in declining to suppress his statements to police, arguing that he asserted his right to remain silent and his right to counsel under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We reject the contentions and affirm.

## RELEVANT PROCEDURAL BACKGROUND

On July 1, 2011, an 11-count information was filed, alleging that appellant committed offenses against five victims. The information charged appellant with attempted forcible rape and kidnapping to commit other crimes regarding Emily M. (Pen. Code, §§ 261, subd. (a)(2), 209, subd. (b)(1); counts 1 and 7); attempted kidnapping to commit another crime regarding V.M. (Pen. Code, §§ 209, subd. (b)(1), 664; count 2); lewd acts upon a child regarding Kaylie S. (Pen. Code, § 288, subd. (c)(1); count 3); kidnapping to commit another crime regarding Debbie F. (Pen. Code, § 209, subd. (b)(1); count 4); and attempted kidnapping to commit another crime regarding Jessica F. (Pen. Code, §§ 209, subd. (b)(1), 664; count 5).[1] Furthermore, with respect to each victim, the information charged appellant with assault with intent to commit a felony (§ 220, subd. (a); counts 6, 8 through 11). Accompanying counts 1, 7, and 8 were allegations that appellant inflicted great bodily injury (§ 12022.8). Appellant pleaded not guilty to all the counts and denied the special allegations. Prior to trial, the charge of lewd acts upon a child (count 3) was dismissed.

At the beginning of the trial, the court denied appellant's motion to suppress certain statements that he made to Los Angeles Police Department (LAPD) detectives, and later denied his motion for reconsideration of the ruling. A jury

---

[1] All further statutory citations are to the Penal Code.

2

found appellant guilty as charged on all counts, with the exception of count 10. Regarding count 10, the jury found appellant guilty of the lesser included offense of assault against Kaylie S. The jury also found true the great bodily injury allegations asserted in connection with counts 1, 7, and 8. The trial court sentenced appellant to two terms of life imprisonment plus 17 years.

## FACTUAL BACKGROUND

A. *Prosecution Evidence*

### 1. *Offenses Against Emily M. (Counts 1, 7, and 8)*

Emily M. was born in May 1993. On March 19, 2009, at approximately 5:55 p.m., she was seated in a secluded outdoor area of the Sherman Oaks Center for Enriched Studies, studying for a test. She saw a Hispanic man standing nearby, watching children on a playing field. He looked into the school windows, and then jumped over a brick wall. Moments later, he placed his hands over Emily's mouth and said, "Shut up." When she resisted, he punched her face. As she retreated from him, his punches made her fall, but she repeatedly got back up on her feet. She eventually found herself on the ground in some bushes, where he choked her and tried to remove her pants and underwear. Emily held onto her clothes and kicked the man, who eventually ran out of the school yard.

After the incident, Emily's left eye orbital was determined to be fractured. DNA material found on Emily's top matched appellant's DNA.

### 2. *Offenses Against Jessica F. (Counts 5 and 6)*

On May 8, 2009, at approximately 5:30 p.m., Jessica F. was walking home from school. She was then 15 years old. She noticed a man driving a silver Volkswagen up and down the street, and thought that he might be looking for a street corn vendor. The man parked near a corn vendor, and walked past her.

3

From behind her, he put an arm around her neck, placed a hand on her mouth, and dragged her toward his car, whose rear passenger door was open. Jessica noticed that there was a tattoo on the man's right forearm. In an effort to escape, Jessica hit the man in the head with a water bottle that she had been holding. The blow caused the man to fall and release her. He ran to his car, closed the rear passenger door, and drove away.

At trial, Jessica identified appellant as her assailant, and appellant showed the jury his right forearm, which bore a tattoo that read "Destinee."[2]

### 3. *Offenses Against V.M. (Counts 2 and 9)*

V.M. was born in February 1996. On November 11, 2009, at approximately 2:00 p.m., she was walking to a friend's house when she noticed a Hispanic man in front of her on the sidewalk. He grabbed her and tried to push her into a nearby car, whose rear door was open. Her screams attracted the attention of two 13-year-old boys, Chris May and Connor Mcaree, who tried to assist her. V. resisted the man, slipped out of his grip, and ran from him. The man then drove away. At trial, May and Mcaree identified appellant as V.'s assailant.

### 4. *Offense Against Kaylie S. (Count 10)*

On April 26, 2010, at approximately 4:25 p.m., Kaylie S. -- then 14 years old -- was waiting in front of her younger brother's elementary school. She planned to meet her brother and ride home with her parents. Appellant drove past her in a gray Volkswagen Jetta, made a U-turn, and parked his car. He left the car and asked Kaylie whether she had seen a certain small child. She noticed that he

---

[2] Jessica acknowledged that after the attack, she identified a different man as her assailant in a photographic lineup.

4

had the name "Destinee" tattooed on one of his arms. Appellant asked her several questions, including whether he could have her phone number, and then grabbed her left breast with his hand. Kaylie pushed him away, entered the school, and phoned 911. When police officers arrived, she gave them the Jetta's license plate number. The officers later determined that appellant was a registered owner of the Jetta.

### 5. *Offenses Against Debbie F. (Counts 4 and 11)*

Debbie F. was born in November 1991. On April 28, 2010, at approximately 3:30 p.m., she was walking from her high school to her father's house. As she neared the house, she entered an alley and saw a parked white SUV. A man left the SUV and opened the vehicle's rear door. As Debbie began to unlatch the gate to the yard of her father's house, the man grabbed her legs, lifted her off the ground, and threw her onto the SUV's rear seat. Debbie then heard shouts from her uncle, Douglas Sanchez. She fled from the SUV, which drove away.

Sanchez noted the SUV's license plate number, and provided it to the police officers who responded to his 911 call. Shortly afterward, appellant was detained while driving a white SUV bearing the reported license plate number. Appellant was later determined to be a registered owner of the SUV.

### 6. *Police Interviews*

On April 28, 2010, LAPD Detectives Alvarez and Cole interviewed appellant regarding the attempted kidnapping of Debbie F. After Alvarez advised appellant of his *Miranda* rights, appellant agreed to the interview and denied any misconduct regarding Debbie F.

The next day, on April 29, 2010, LAPD Detectives Doerbecker and Blizzard interviewed appellant. At the beginning of the interview, Doerbecker reminded appellant that Alvarez and Cole had advised him regarding his *Miranda* rights, and that he had waived them before speaking to Alvarez and Cole. Appellant agreed to talk to Doerbecker and Blizzard.

Appellant said that when he saw Debbie F., she winked at him. He maintained that he only wanted to scare her, and that he had no plan to rape or kill her. He stopped his car, picked her up off the ground, and tried to put her in his car. When "some guy came out," he drove away.

Appellant further stated that he saw Kaylie S. near an elementary school while driving his girlfriend's Jetta. He parked the car, approached her, and grabbed her breast, but left when she told him to stop.

Regarding Emily M., appellant stated that he was walking around the campus of the Sherman Oaks Center for Enriched Studies when he began talking to her. A fist fight between them ensued, and after a while, he walked away. He denied that he intended to kill Emily, but admitted that he wanted to have sex with her.

Appellant acknowledged that he grabbed V.M., but denied any recollection of the incident involving Jessica F. He further stated that he had attacked as many as ten victims. After the attacks, he went home and masturbated. He said that his fantasy was to be able to rape somebody, and that he had once paid a prostitute to act out a rape fantasy.

B. *Defense Evidence*

LAPD Detective Katherine Gosser testified that on March 19, 2009, she spoke to Emily M. in a hospital in Tarzana. Emily said that her assailant covered her face with his hands and said, "Sh," which Emily understood to mean, "Don't

6

say anything." He then pushed her to the ground, and repeatedly kicked and punched her. When she tried to stand up, he shoved her back down. She moved away from him, but he followed her. Eventually, he pushed her into some bushes and began choking her. He also tried to rip her clothing off. She resisted furiously and broke his grip on her.

LAPD Detective Scott Crowe testified that after the incident involving V.M., he interviewed Chris May. According to Crowe, May said that he could not identify V.'s assailant because he saw him at a distance.

LAPD Officer Jusef Kassis testified that when he interviewed Jessica F., she recalled no tattoos on her assailant.[3]

## DISCUSSION

Appellant contends the trial court erred in denying his motions to suppress his statements during the April 29, 2010 interview with Detective Doerbecker and his colleagues. As explained below, we disagree.

### A. *Governing Principles*

In *Miranda*, the United States Supreme Court "adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation. [Citation.] . . . [¶] To counteract the coercive pressure, *Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. [Citation.] After the warnings are given, if the suspect indicates

---

[3] In rebuttal, the prosecution presented testimony from Paula F., Jessica F.'s sister. According to Paula, after the attack, Jessica said that her assailant had a tattoo on his right arm.

7

that he wishes to remain silent, the interrogation must cease.  [Citation.]  Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present.  [Citation.]  Critically, however, a suspect can waive these rights.  [Citation.]" (*Maryland v. Shatzer* (2010) 559 U.S. 98, 103-104.)

Once suspects have waived their *Miranda* rights, in order to halt police questioning after it has begun, suspects must "unambiguously" assert their right to counsel or silence.  (*Davis v. United States* (1994) 512 U.S. 452, 459 [right to counsel] (*Davis*); *Berghuis v. Thompkins* (2010) 560 U.S. 370, __ [130 S.Ct. 2250, 2260] [right to silence] (*Berghuis*).)  Thus, after a suspect's *Miranda* rights have been waived, if the suspect makes an ambiguous or equivocal statement concerning the right to counsel or silence, the police are not required to end the interrogation, or ask questions to clarify whether the suspect wishes to invoke his or her *Miranda* rights.  (*Davis*, *supra*, 512 U.S. at pp. 461-462; *Berghuis*, *supra*, 130 S.Ct. at pp. 2259-2260; *People v. Martinez* (2010) 47 Cal.4th 911, 947-948 (*Martinez*).)  The invocation of the right to counsel or silence is assessed by reference to how a reasonable police officer would understand the suspect's remarks.  (*Davis*, *supra*, 512 U.S. at p. 459; see *Berghuis*, *supra*, 130 S.Ct. at p. 2260; *People v. Nelson* (2012) 53 Cal.4th 367, 376-378 (*Nelson*).)

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502.)

B.  *Interviews*

1.  *First Interview*

On April 28, 2010, LAPD Detectives Alvarez and Cole interviewed appellant regarding the incident involving Debbie F.  Shortly after the interview began, Cole advised appellant of his *Miranda* rights, and appellant affirmed that he understood those rights:

"Detective Cole: . . .  You have the right to remain silent.  Do you understand?

"[Appellant]:  Yes.

"[Detective Cole:  Anything you say may be used against you in court.  Do you understand?

"[Appellant]:  Yes.

"Detective Cole:  You have the right to the presence of an attorney before and during any questioning,  Do you understand?

"[Appellant]:  Yes.

"Detective Cole:  If you cannot afford an attorney, one will be appointed for you free of charge, before any questioning, if you want.  Do you understand?

"[Appellant]:  Yes."

Following the advisements, appellant agreed to "talk about what happened." Throughout the interview, appellant repeatedly denied that he attempted to kidnap Debbie F.

Near the midpoint of the interview, Detective Sanchez joined Detectives Alvarez and Cole.  Sanchez told appellant:  "So, again, let me emphasize.  The reason you are here is to give your side of the story. . . .  If you don't want to say anything, that's fine.  That's your right.  Be quiet.  Don't answer any questions and we'll go off.  We'll all leave.  You go to jail and you go to court sometime in the future. . . ."  Appellant replied, "Okay."

Shortly afterward, Alvarez told appellant that his public defender would explain that "an attempt" was the same as "completing the act," and Sanchez urged appellant to "give a statement." The following colloquy then occurred:

"[Appellant]: I'm not going to say anything no more. You guys can't make me say anything. I'm not going to say --

"Detective Sanchez: What's that?

"[Appellant]: I'm not going to say anything no more.

"Detective Sanchez: You don't want to answer any more questions?

"[Appellant]: No more questions."

"Detective Sanchez: All right."

When the detectives asked appellant to stand up and relax, the following exchange took place:

"Detective Sanchez: Are you willing to take a lie detector test?

"[Appellant]: Yeah.

"Detective Sanchez: Yes? Good. We'll get that set up for you.

"[Appellant]: All right."

After appellant agreed to the polygraph test, the interview ended.


    2.  *Second Interview*

The next day, appellant was interviewed by Detectives Doerbecker and Blizzard. At the beginning of the interview, Blizzard reminded appellant that he had talked to detectives the previous night. The following dialogue then occurred:

"Detective Blizzard: . . . And I know that the detectives admonished you of your *Miranda* rights.

"[Appellant]: Yes.

"Detective Blizzard: Of your rights.

"[Appellant]: Yes.

10

"Detective Blizzard:  And you waived your rights and you agreed to speak to them.

"[Appellant]:  Yes.

"Detective Blizzard:  Okay.  So you want to talk to my partner and I as well?

 "[Appellant]:  Okay.

"Detective Blizzard:  It that okay?

"[Appellant]:  Yeah."

When Blizzard urged appellant to describe what had happened regarding Jessica F., appellant initialed the following dialogue:

"[Appellant]:  Can I ask a question?

"Detective Blizzard:  Yes.

"[Appellant]:  How come I haven't talked to a, like, attorney or something?

"Detective Blizzard:  How come what?

"[Appellant]:  That I haven't talked to, like to an attorney or something like that?

"Detective Blizzard:  Because --

"Detective Doerbecker:  You'll -- you'll get assigned an attorney when you're arraigned if you -- if you want one free from the state.  They'll give you one then.  If you want to hire one, you can hire one whenever you want[,] but that's why."

Appellant made no further references to an attorney.  In response to the detectives' questions, he admitted his participation in several of the offenses charged against him.

C.  *Underlying Proceedings*

Prior to trial, appellant filed a motion to suppress his statements during the second interview, arguing that Doerbecker and Blizzard failed to re-advise him of

his *Miranda* rights, and questioned him after he invoked his right to counsel. In denying the motion, the trial court concluded that during the first interview, Cole gave "clear and sufficient" advisements regarding appellant's *Miranda* rights, and that at the beginning of the second interview, Doerbecker and Blizzard provided an "implied readvisement" of those rights. The court further determined that during the second interview, appellant did not invoke his right to counsel when he asked why he had not spoken to an attorney. Although the trial court remarked that Doerbeker's response to appellant's question was "troubling," it found no defect of "constitutional dimension[]" that mandated suppressing appellant's statements.

Later, appellant asked the court to reconsider its ruling, arguing that he invoked his right to remain silent at the end of the first interview. The court concluded that appellant made no "clear invocation of his right to remain silent," noting that appellant immediately agreed to a polygraph test, which necessarily involved further questioning, and later agreed to talk to Doerbecker and Blizzard after they reminded him that he had heard and waived his *Miranda* rights.

### D. *Appellant's Contentions*

Appellant contends he unequivocally invoked his right to silence at the end of the first interview, and unequivocally invoked his right to counsel during the second interview.

#### 1. *No Invocation of Right to Silence*

We agree with the trial court that appellant did not invoke his right to silence during the first interview. After the suspect has waived his right to silence, officers are not obliged to stop their questioning absent an unambiguous invocation of that right. (*Berghuis*, *supra*, 130 S.Ct. at p. 2260.) This "bright-line rule" permits officers to continue questioning unless the suspect clearly invokes the right to

12

silence, as determined under the reasonable-officer standard. (*Nelson*, *supra*, 53 Cal.4th at p. 377.) Although it is often "good police practice" for officers to make clarifying inquiries when the suspect makes an ambiguous or equivocal statement, there is no duty to do so. (See *Davis*, *supra*, 512 U.S. at p. 461; *Nelson*, *supra*, 53 Cal.4th at p. 377.)

Under these principles, remarks that facially suggest a desire to halt police questioning do not, in fact, invoke the right to silence if they are reasonably viewed as unclear or equivocal. (*Berghuis*, *supra*, 130 S.Ct. at p. 2260; *Nelson*, *supra*, 53 Cal.4th 367.) In *People v. Stitely* (2005) 35 Cal.4th 514, 534, the defendant denied his complicity in the underlying crime and said to the interrogating officer, "I think it's about time for me to stop talking." However, when the officer responded, "You can stop talking," the suspect continued to deny that he committed the crime. (*Ibid.,* italics omitted.) Our Supreme Court determined that a reasonable officer would have concluded that the suspect's remark expressed only "apparent frustration," rather than an unequivocal desire to stop the interrogation. (*Id*. at pp. 535-536.) In so holding, the court noted that the officer gave the suspect a clear opportunity to invoke his right to silence by stopping the interview and reminding him of his right to "'stop talking.'" (*Id*. at pp. 535-536.)

In *People v. Jennings* (1988) 46 Cal.3d 963, 977, the defendant said to the interrogating officers, "I'll tell you something right now. You're scaring the living shit out of me. I'm not going to talk.," and "I'm not saying shit to you no more, man. You, nothing personal man, but I don't like you. You're scaring the living shit out of me. . . . That's it. I shut up." Shortly thereafter, the defendant apologized for his remarks and continued to answer questions. (*Id*. at p. 979.) In view of the defendant's conduct and the circumstances surrounding the interrogation, our Supreme Court concluded that his statements did not invoke the

13

right to silence, but expressed "only momentary frustration and animosity" toward one of the interrogating officers. (*Id*. at pp. 978-979.)

Again, in *Martinez*, a detective issued *Miranda* advisements to the defendant, who agreed to an interview regarding a specific assault. (*Martinez, supra,* 47 Cal.4th at pp. 944-945.) When the defendant said, "'That's all I can tell you,'" the detective ended the interrogation. (*Id*. at p. 944.) The next morning, two other detectives met with the defendant, reminded him that he had previously waived his *Miranda* rights, and interrogated him regarding the assault and other crimes. (*Id*. at pp. 944-946.) During the interrogation, the defendant said, "'I don't want to talk anymore right now.'" (*Id*. at p. 945.) In response, the detectives announced that they intended to take a break, urged the defendant to "'think about it,'" and said that they would come back and talk to him. (*Id*. at pp. 951-952.) The defendant replied, "'Okay,'" and the detectives resumed their questioning after a break. (*Id*. at 952.)

In concluding that the defendant did not invoke his right to silence during the initial interrogation, the Supreme Court determined that the defendant's remark, "That's all I can tell you," was reasonably viewed as merely meaning, "'That's my story, and I will stick with it.'" (*Martinez, supra,* 47 Cal.4th at pp. 949-950.) The court further concluded that the detectives conducting the second interview were not obliged to re-administer *Miranda* advisements, as the defendant's response to their reminder showed his understanding of the *Miranda* rights. (*Id*. at p. 950.) The court also held that the defendant's statement during the second interview did not invoke his right to silence, remarking that the detectives employed "'good police practice'" aimed at clarifying the defendant's statement by proposing a break and encouraging him to "'think about it.'" (*Id.* at pp. 951-952, quoting *Davis*, *supra*, 512 U.S. at p. 461.)

We conclude that appellant never invoked his right to silence during the first interview. To begin, the record shows that appellant was clearly apprised of that right and understood it. In addition to the *Miranda* advisements administered by Cole, Sanchez told appellant: "So, again, let me emphasize. . . . If you don't want to say anything, that's fine. That's your right. Be quiet. Don't answer any questions and we'll go off. We'll all leave. You go to jail and you go to court sometime in the future. . . ." In replying "Okay," appellant manifested his understanding that he was entitled to end all questioning.

The record also establishes that appellant never invoked that right, as determined under the "bright-line rule" (*Nelson*, *supra*, 53 Cal.4th at p. 367). Appellant said, "I'm not going to say anything no more. *You guys* can't make me say anything," and later, "No more questions." (Italics added.) In response, the detectives halted their questioning. However, in view of the italicized phrase, it was reasonable for Sanchez to clarify whether appellant's statements expressed transitory frustration toward the detectives, rather than a unequivocal desire to end questioning, by asking whether appellant would take a polygraph test. Because appellant agreed to the test, he necessarily approved further questioning. Furthermore, the next day, appellant agreed to questioning by Doerbecker and Blizzard *after* they reminded him of his *Miranda* rights.

Appellant's reliance on *Michigan v. Mosley* (1975) 423 U.S. 96 and *People v. DeLeon* (1994) 22 Cal.App.4th 1265 is misplaced. In each case, the defendant was advised of his *Miranda* rights and clearly invoked them regarding a specific crime, but agreed to a second interview regarding other crimes after receiving a fresh set of *Miranda* advisements. (*Michigan v. Mosley*, *supra*, 423 U.S. at pp.104-105; *People v. DeLeon*, *supra*, 22 Cal.App.4th at p. 1268.) The courts held that the second interview did not contravene the defendant's invocation of his *Miranda* rights because it concerned different crimes. (*Michigan v. Mosley*, *supra*,

15

at pp. 105-106; *People v. DeLeon*, *supra*, at pp. 1268-1272.)  In contrast, appellant never unequivocally invoked his right to silence during the first interview.

### 2. *No Invocation of Right to Counsel*

We also agree with the trial court that appellant did not invoke his right to counsel during the second interview.  Generally, to invoke that right, "[t]he suspect must articulate sufficiently clearly his or her desire to have counsel present so that a reasonable officer in the circumstances would understand the statement to be a request for an attorney.  [Citation.]  '[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer *in light of the circumstances* would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.'  [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 432 (*Williams*), quoting *Davis*, *supra*, 512 U.S. at p. 459.)

An instructive application of these principles is found in *Williams* and *People v. Davis* (2009) 46 Cal.4th 539.  In *Williams*, the defendant agreed to an interview with the interrogating detectives, who suggested that he was complicit in a murder.  (*Williams, supra,* 49 Cal.4th at pp. 431-432.)  The defendant said, "'I want to see my attorney cause you're all bullshitting now,'" but denied that he participated in the crime.  (*Id*. at p. 431.)  When a detective asked, "'Do you want your attorney now or do you want to talk to us?,'" the defendant replied, "'I'll talk to him,'" but nonetheless agreed to continue the interview on the condition that one of the detectives remained silent.  (*Ibid.,* italics omitted.)  The Supreme Court concluded that viewed in the totality of the circumstances, the defendant's references to an attorney constituted an expression of frustration, rather than an invocation of the right to counsel.  (*Id*. at pp. 432-433.)

In *People v. Davis*, when the interrogating detectives accused the defendant

16

of a kidnapping, he responded, "'Well then book me and let's get a lawyer and let's go for it.'" (*People v. Davis, supra*, 46 Cal.4th at pp. 587-588.) The defendant further stated that he would answer what he called "routine questions," but resented accusations that he participated in the crime. (*Id*. at p. 587.) The Supreme Court determined that the defendant's remark to the detectives constituted the defendant's application of a "'challenge'" technique to deflect questions, rather than a request for counsel. (*Id*. at p. 587.)

Here, the record establishes that appellant did not invoke his right to counsel. To begin, we note that appellant never expressly requested counsel, even when Alvarez suggested during the first interview that appellant's public defender would explain to him that "an attempt" was the same as "completing the act." Rather, when appellant made the pertinent reference to an attorney during the second interview, he framed his remark as a request for information. The record discloses the following dialogue:

"[Appellant]: Can I ask a question?

"Detective Blizzard: Yes.

"[Appellant]: How come I haven't talked to a, like, attorney or something?

"Detective Blizzard: How come what?

"[Appellant]: That I haven't talked to, like to an attorney or something like that?"

Because appellant had never asked to talk to an attorney, yet used the past tense to express his question, Blizzard reasonably interpreted appellant to be inquiring how and when he might obtain representation, as no attorney had talked to him up to that point. That inquiry is unsurprising, in view of the fact that the *Miranda* advisements appellant received did not expressly advise him when, in the absence of a request for counsel, an attorney would be appointed to represent him. In *Duckworth v. Eagan* (1989) 492 U.S. 195, 198, the interrogating officers issued

17

*Miranda* advisements to the defendant informing him, inter alia, that he had a right to counsel during questioning, the right to stop questioning until he had talked to a lawyer, and the right to stop questioning at any time. In addition, the officers said, "[An attorney] will be appointed for you, if you wish, if and when you go to court." (*Ibid.,* italics omitted.) After the defendant waived his rights and confessed to the crime alleged against him, the Seventh Circuit concluded that the additional information rendered the *Miranda* advisements constitutionally defective, reasoning that it suggested that indigents lacked the right to appointed counsel before any interrogation. (*Id*. at p. 199.) The United States Supreme Court reversed that decision, concluding that the defendant had received adequate *Miranda* advisements, and that the additional information was merely an accurate statement of state procedure regarding the appointment of counsel. (*Id*. at pp. 203-204.) In so holding, the high court remarked that "it must be relatively commonplace for a suspect, after receiving *Miranda* warnings, to ask when he will obtain counsel." (*Id*. at p. 204, italics omitted.) That is the type of procedural information that Blizzard provided to appellant.

Viewed in the totality of the circumstances, appellant's inquiry did not constitute a clear invocation of his right to counsel under *Miranda*. When Doerbecker told appellant that an attorney would be appointed for him at his arraignment unless he hired a private attorney, appellant did not say he wished to speak to an attorney before further questioning, or even that he wanted counsel appointed, despite having been previously advised that if he could not afford an attorney, one would be appointed for him "free of charge, before any questioning." Instead, appellant answered the detectives' questions with no further reference to counsel, even though he had been told -- and claimed to have understood -- that he could end the interview at any time (see pt. D.1, *ante*). Because appellant's inquiry was reasonably interpreted as a general procedural question regarding the

18

appointment of counsel if he wished representation, rather than a request for counsel, the interrogating detectives had no duty to clarify the inquiry.  (*Davis*, *supra*, 512 U.S. at pp. 461-462; *Berghuis*, *supra*, 130 S.Ct. at pp. 2259-2260.)  In short, the trial court did not err in denying appellant's motion to suppress his statements.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:



WILLHITE, Acting P. J.



SUZUKAWA, J.